The Attorney General brought an action on behalf of the Commonwealth pursuant to G. L. c. 93A, § 4, alleging that the defendants engaged in deceptive business practices against purchasers of surplus lines insurance. The Commonwealth contended that, for years, the defendants charged their clients hidden agency fees by altering or withholding legal documents. Following a twenty-two day jury-waived trial, a judge of the Superior Court determined that defendant Andrew Crowther's active concealment of agency fees was a deceptive practice in violation of c. 93A. However, the judge found codefendant Kathleen Burke not liable. The judge ordered Crowther to "pay damages in the nature of restitution," which represented "any money Crowther received above a twenty percent commission." The judge also ruled that the KIA defendants were vicariously liable for Crowther's actions, on the basis of apparent authority.[3] Final judgment entered in the amount of $2,183,637.30 plus statutory interest against Crowther and the KIA defendants. All parties except Burke have appealed. After comprehensive review of the substantial record before us, we affirm.
1. Standard of review. Where, as here, the judge served as the finder of fact, her findings must stand "unless clearly erroneous." Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996). We give due regard to the judge's ability to assess the credibility of the witnesses, an opportunity not available to us. See Crown v. Kobrick Offshore Fund, Ltd., 85 Mass. App. Ct. 214, 224 (2014). A finding is not clearly erroneous if it is "supported on any reasonable view of the evidence, including all rational inferences of which it was susceptible." Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 510 (1997) (quotation omitted).
2. Background facts. We recite the facts as found by the trial judge, supplemented where necessary by undisputed evidence from the record. We reserve additional procedural facts relating to the KIA defendants' appeal for later discussion.
a. Surplus lines insurance and placement. We start with a brief overview of the surplus lines insurance industry. Surplus lines insurance carriers fill a niche for higher risk clients who are unable to obtain insurance in the standard or admitted markets. In a typical surplus lines transaction, a client in need of insurance contacts a retail broker like Crowther. In turn, the retail broker speaks to one or more wholesale brokers, seeking the best bottom-line price for the client.[4] After checking with the surplus lines insurance carriers that provide the desired coverage, the wholesale broker provides the retail broker with a written quote, which is then relayed to the client. Ordinarily, the bottom-line premium price contained in the quote includes a commission for the brokers.[5] If the client agrees to the terms of the quote, the insurer or wholesale broker issues a "binder" to the retail broker, who relays that document to the insured to formalize the coverage.[6] Since the premium owed to the insurer must be paid up front, retail brokers often offer premium financing through separate companies. Additionally, within twenty days of procurement, the wholesale broker must file a surplus lines affidavit signed by the insured, or their authorized designee, with the Division of Insurance (DOI).[7] See G. L. c. 175, § 168.
b. Crowther's relationship with KIA. In late 1995 or early 1996, Crowther began his affiliation with defendants Jeffrey and Cyrus Kilgore as an in-house insurance producer.[8] Specializing in surplus lines, Crowther agreed to split his compensation with their agency in exchange for, among other things, office space, supplies, and administrative services. Jeffrey and Cyrus[9] assigned several customer service representatives, including defendant Kathleen Burke, to assist him.
Although Crowther was the main point of contact for his clients, KIA's name -- not Crowther's -- appeared on all major insurance documents. For example, KIA billed Crowther's clients directly using the KIA invoicing system, and then paid Crowther his share. Insurance binders, surplus lines affidavits, and premium finance agreements always listed KIA as the "producer," "broker," or "agency." Cyrus signed the affidavits and binders, and either Cyrus, Jeffrey, or Burke signed the finance agreements.[10] Additionally, when Crowther communicated with his clients, he used the KIA telephone number as well as the KIA computer network, and included the KIA name in his electronic mail (e-mail) signature line.
c. Crowther's business practices. Crowther routinely rolled agency fees into the premiums established by the insurance carriers, and presented the augmented figure to his clients as "the total cost."[11] In Crowther's view, his clients were interested only in obtaining the lowest bottom-line price.[12] Nevertheless, Crowther took active steps to conceal the undisclosed agency fees from these clients. First, Crowther (or more often the customer service representatives performing clerical functions at his direction) "whit[ed] out" the premiums set forth on the policy declarations pages and inserted the total cost figures quoted to and accepted by his clients. Second, Crowther created invoices, outside the usual invoicing system, showing total cost instead of the true premium set by the insurer. Third, Crowther routinely signed, without authorization, the insureds' names to the surplus lines affidavits (which contained the true premiums). Fourth, Crowther either altered the premium finance agreements by removing any reference to the true premiums and agency fees, or failed to mail to the insureds the third page of the agreements containing the true premium. As the judge found after hearing the evidence, these practices occurred when there were no formal laws or regulations regarding "fees which [could] be charged for surplus lines insurance placement, disclosure of those fees[,] or recalculation by the retail broker of the 'premium' set by the insurer."
With all of this in mind, the judge found that Crowther "deliberately kept his clients in the dark as to matters which directly impacted the cost of the clients' insurance." He did so, according to the judge, to deprive them of the opportunity to negotiate his compensation.
3. Rulings of law. The judge concluded that Crowther's active concealment of the agency fees, "particularly considering the size of the agency fee in most instances," was a deceptive practice that violated c. 93A. The judge reasoned that Crowther's actions had the capacity to mislead his clients and prospective clients to act differently from the way they otherwise would have acted (i.e., purchasing insurance policies that they might not have purchased if they were aware of Crowther's fees). See Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 777 (1980) ; Aspinall v. Phillip Morris Cos., 442 Mass. 381, 394 (2004).
4. Discussion. a. Commonwealth's appeal. i. Twenty percent commission retention. The Commonwealth first contends that the judge erred in fashioning the restitution remedy, and in failing to require full disgorgement of all fees acquired by the defendants. We disagree. Pursuant to G. L. c. 93A, § 4, as appearing in St. 1969, c. 814, § 3, a judge may "make such ... orders or judgments as may be necessary to restore to [the injured parties] any moneys ... which may have been acquired by means of [the unlawful acts]." This permissive language allows the courts to use their traditional equity power to tailor appropriate remedies to the facts of each case. See Commonwealth v. DeCotis, 366 Mass. 234, 245 (1974). See also Kattar v. Demoulas, 433 Mass. 1, 17 (2000) ("[Chapter] 93A provides the possibility for broad, far-reaching equitable relief"). Restitution is one recognized equitable remedy in a § 4 case. See DeCotis, 366 Mass. at 244-245 ; Commonwealth v. AmCan Enterprises, Inc., 47 Mass. App. Ct. 330, 337 (1999). Thus, contrary to the Commonwealth's claim, neither the language of § 4, nor anything in our case law, required the judge to select the complete disgorgement of profits as the damages remedy.
Moreover, on the facts of this case, the judge did not abuse her broad discretion in fashioning a remedy that required the defendants to turn over all profits above a twenty percent commission. See Demoulas, 433 Mass. at 17-18. See also Augustine v. Rodgers, 47 Mass. App. Ct. 901, 902 (1999) ("That rescission was an available remedy does not lead to the conclusion that it was required.... [R]escission is an equitable remedy awarded at the discretion of the court"). Indeed, the evidence showed that placing surplus lines policies is "work-intensive"; that the standard ten percent commission is far less than that on other lines of insurance, which rises to thirty to forty percent in some cases; that there is little rationale underlying the various sizes of these commissions; and that some surplus lines retail brokers actually do charge a twenty percent fee.[13] Under these circumstances, the restitution awarded was an appropriate remedy. See Keller v. O'Brien, 425 Mass. 774, 778 (1997).
ii. Burke's liability. The Commonwealth next argues that the judge erred as a matter of law by failing to extend c. 93A liability to Burke. See R.W. Granger & Sons, Inc. v. J & S Insulation, Inc., 435 Mass. 66, 73 (2001) ("A ruling that conduct violates G. L. c. 93A is a legal, not a factual, determination"). In declining to hold Burke liable, the judge reasoned that Burke was following the directions of her supervisor, and neither planned nor had a financial stake in his business practices. We conclude that the judge did not err as a matter of law in ruling that Burke's administrative role in Crowther's scheme did not rise to the level of unscrupulous conduct contemplated by c. 93A. See DeCotis, 366 Mass. at 242 ; Turnpike Motors, Inc. v. Newbury Group, Inc., 413 Mass. 119, 131 (1992) ; Beverly v. Bass River Golf Mgmt., Inc., 92 Mass. App. Ct. 595, 606 (2018).
To the extent that the Commonwealth challenges the judge's subsidiary findings, they were amply supported by Burke's testimony and the reasonable inferences that could be drawn from it. See Edinburg v. Edinburg, 22 Mass. App. Ct. 199, 203 (1986), quoting from New England Canteen Serv., Inc. v. Ashley, 372 Mass. 671, 675 (1977) ("[T]he judge's assessment of the quality of the testimony is entitled to our considerable respect because 'it is the trial judge who, by virtue of [her] firsthand view of the presentation of evidence, is in the best position to judge the weight and credibility of the evidence' ").
First, Burke performed administrative and clerical tasks working under Crowther's direction and control. Before Crowther's arrival, Burke did not "work that much with surplus lines." As instructed by Crowther upon his arrival, Burke consistently used a "total cost" figure on all paperwork she generated for him for presentation to his clients. She did not question Crowther about the reasons underlying his instructions; she just followed them. In addition, Burke understood from Crowther's instructions "to go ahead and place the insurance" that (a) he had explained the purposes of the surplus lines affidavits to the clients; and (b) had obtained their authorization for Crowther (and his assistants) to sign them.
According to Burke, she was not involved in establishing premiums or setting the agency fees charged to Crowther's clients. She had no substantive conversations with Crowther's clients and was not privy to what Crowther told them; and in light of her knowledge of industry customs and practices, she did not believe that she did anything illegal or deceptive.[14] Insofar as the Commonwealth argues that the judge was required to find Burke liable on an aiding and abetting theory, the judge may reasonably have concluded that Burke did not unlawfully aid actions she did not understand to be wrong. See Go-Best Assets Ltd. v. Citizens Bank of Mass., 463 Mass. 50, 64 (2012).
While Burke is a licensed insurance producer, the evidence reasonably could be taken to establish that she was not acting in that capacity in connection with the acts deemed c. 93A violations. In contrast to the millions reaped by Crowther and the KIA defendants, Burke received only a salary from KIA and no additional benefits. Under these circumstances we cannot say that Burke's conduct rose to the level of "unscrupulous, coercive, or '[i]ntentionally gainful misconduct' that is characteristic of wrongdoing under G. L. c. 93A." Bass River Golf Mgmt., Inc., 92 Mass. App. Ct. at 606, quoting from McGonagle v. Home Depot U.S.A., Inc., 75 Mass. App. Ct. 593, 600 n.9 (2009). The judge did not err in declining to extend liability to Burke in view of the evidence supporting her claim that she played an unwitting, subordinate role. See DeCotis, 366 Mass. at 242 ("The existence of unfair acts and practices must be determined from the circumstances of each case"). See also Turnpike Motors, Inc., 413 Mass. at 131 ("Notwithstanding the fact that we might arrive at a different conclusion with respect to this issue, we cannot state that the judge was completely unjustified in viewing this matter [how she did]").
iii. Denial of other relief. The Commonwealth lastly contends that the judge erred in declining to impose civil penalties and award attorney's fees. Again, we are unpersuaded. The language of § 4 is clear that these type of sanctions are discretionary:
"If the court finds that a person has employed any method, act or practice which he knew or should have known to be in violation of said section two, the court may require such person to pay to the commonwealth a civil penalty of not more than five thousand dollars for each such violation and also may require the said person to pay the reasonable costs of investigation and litigation of such violation, including reasonable attorneys' fees" (emphases added).
G. L. c. 93A, § 4, as amended by St. 1985, c. 468. See AmCan Enterprises, Inc., 47 Mass. App. Ct. at 338 ("[E]ach [act of deception] may be viewed as a separate statutory violation for which a judge may, under G. L. c. 93A, § 4, impose a separate civil penalty" [emphases added] ). Even assuming scienter, the factual context in which the violations occurred supported the judge's discretionary ruling. See Commonwealth v. ELM Med. Labs., Inc., 33 Mass. App. Ct. 71, 84 n.16 (1992) ; Commonwealth v. Chatham Dev. Co., 49 Mass. App. Ct. 525, 529 (2000). The evidence showed that (1) Crowther committed these acts at a time when agency fee practices were unregulated; (2) he was not fully aware that his practices were improper; and (3) the victims were sophisticated business clients who chose not to ask Crowther questions about his compensation before purchasing their insurance. On these facts, the Commonwealth has failed to show that the judge abused her discretion in refusing to impose the added punishment of civil fines and attorney's fees. See ibid.
b. Crowther's cross appeal. Crowther asserts that the judge's c. 93A ruling was erroneous for a number of reasons. The arguments are unavailing.[15] First, the judge was warranted in concluding, as a matter of law, that Crowther's active concealment of the agency fees was a deceptive practice that violated c. 93A. See Purity Supreme, Inc., 380 Mass. at 777 ; Aspinall, 442 Mass. at 394. Indeed, the evidence demonstrates that, had Crowther's clients been privy to the agency fees that he had concealed, they may have "act[ed] differently from the way [they] otherwise would have acted" by seeking to negotiate his compensation[16] or purchase other insurance. Purity Supreme, Inc., 380 Mass. at 777. See Klairmont v. Gainsboro Restaurant, Inc., 465 Mass. 165, 175 (2013).
Crowther's various attempts to dispute this conclusion are misguided. First, he essentially contends that the judge's finding that he "actively concealed" the agency fees is clearly erroneous. To the contrary, the evidence in support of this finding is overwhelming and need not be repeated here. See Demoulas, 424 Mass. at 510. Second, there is no merit to Crowther's argument that the altered and withheld documents were immaterial. Indeed, as noted above, Crowther's acts of concealment were material insofar as they deprived his clients of the opportunity to negotiate or obtain cheaper insurance. See Klairmont, 465 Mass. at 175. Third, to the extent Crowther argues that there was no causal connection between his actions and any loss suffered by his clients, he cites no evidence indicating that the judge's finding to that effect was clearly erroneous. See DiMarzo v. American Mut. Ins. Co., 389 Mass. 85, 100-101 (1983).
Each of Crowther's remaining arguments are based on mischaracterizations of the judge's findings and rulings. A fair reading of the judge's decision undercuts Crowther's argument that the judge applied the wrong G. L. c. 93A, § 9, standard "to this [§] 11 business case." Notwithstanding that this case actually arose under § 4, footnote fifteen of the judge's decision (of December 3, 2013) establishes that she properly considered the sophisticated nature of Crowther's clients, and recognized the distinctions between § 11 and § 9 standards in evaluating a claimed c. 93A violation. See Kattar, 433 Mass. at 14 ; Giuffrida v. High Country Investor, Inc., 73 Mass. App. Ct. 225, 238 (2008). Next, the judge did not, as Crowther argues, "appl[y] the wrong concept of unfairness to determine that the charging of any fee above [twenty percent] was unfair." The judge grounded Crowther's c. 93A liability on his deceptive conduct, specifically finding that Crowther's conduct was not unfair within the meaning of G. L. c. 93A, § 2(a ).
c. KIA defendants' cross appeal. On cross appeal, the KIA defendants argue that the judge erred in granting the Commonwealth's renewed motion for summary judgement on the issue of vicarious liability. Primarily, they contend that the Commonwealth failed to sustain its burden in establishing the elements of apparent authority. We disagree.
By way of procedural background, on May 10, 2012, the judge issued an order bifurcating the trial. For the sake of efficiency, the issue whether Crowther and Burke violated c. 93A was to be tried first, followed by a second trial on the KIA defendants' vicarious liability "if necessary." However, in her December 3, 2013, order for partial judgment after the first phase of trial, the judge stated that she was "inclined to find from the evidence presented thus far, an agency relationship, based on apparent authority, as between Crowther and the Kilgore defendants." Thereafter, the judge ordered briefing on whether the Commonwealth had established a prima facie case of apparent authority. Post-briefing, she concluded that it had, and ordered the KIA defendants to submit an offer of proof rebutting the Commonwealth's evidence and demonstrating a question of material fact. Following the offer, she asked the Commonwealth to renew its motion for summary judgment, which she then allowed in a comprehensive memorandum and order.[17]
We review a grant of summary judgment de novo to determine whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law. Chambers v. RDI Logistics, Inc., 476 Mass. 95, 99 (2016). The moving party bears the burden of establishing the absence of a triable issue. SCA Servs., Inc. v. Transportation Ins. Co., 419 Mass. 528, 531 (1995). If the moving party is successful, the opposing party "must respond and allege specific facts establishing the existence of a [genuine issue of] material fact in order to defeat the motion." Ibid.
"A principal is liable for the agent's conduct when the agent acts with the actual or apparent authority of the principal in [a] transaction." Fergus v. Ross, 477 Mass. 563, 566 (2017) (quotation omitted). Apparent authority exists when conduct by the principal "causes a third person reasonably to believe that a particular person ... has authority to enter into negotiations or to make representations as his agent." Hudson v. Massachusetts Property Ins. Underwriting Assn., 386 Mass. 450, 457 (1982) (quotation omitted). Only the words and conduct of the principal are considered in making an apparent authority determination, and "[t]he principal's manifestation of apparent authority does not need to be direct communication with the third party." Fergus, 477 Mass. at 567. Moreover, contrary to the defendants' assertion throughout this litigation, detrimental reliance is not an element of apparent authority.[18] See Hudson, 386 Mass. at 457 (distinguishing between apparent authority and estoppel and including reliance only as an element of the latter); Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 16-17 (1997) (finding apparent authority without discussing detrimental reliance); Barrow v. Dartmouth House Nursing Home, Inc., 86 Mass. App. 128, 132-134 (2014) (bifurcating apparent authority and equitable estoppel analyses and incorporating detrimental reliance only in the test for estoppel). See also Restatement (Third) of Agency § 2.03 comment e (2006) ("To establish that an agent acted with apparent authority, it is not necessary for the plaintiff to establish that the principal's manifestation induced the plaintiff to make a detrimental change in position, in contrast to the showing required by the estoppel doctrines ...").
The summary judgment record supports the judge's conclusion that, on the issue of apparent authority, there was no genuine issue of material fact and the Commonwealth was entitled to judgment as a matter of law. See Chambers, 476 Mass. at 99. Initially, the Commonwealth's proffer was sufficient to establish the elements of apparent authority. As to the KIA defendants' "manifestation" of apparent authority, the evidence shows, inter alia, that they billed all of Crowther's clients directly using the KIA invoicing system. In addition, the KIA name was also listed as some variation of "producer" in all binders, surplus lines affidavits, and premium finance agreements. For these reasons, as well as those stated in the judge's memorandum and order allowing the Commonwealth's renewed motion for summary judgment, such communication was enough to satisfy the manifestation requirement in the present case. See Linkage Corp., 425 Mass. at 16-17 ; Fergus, 477 Mass. at 567. Contrast Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 745-746 (2000) (no apparent authority where only manifestation was authorized use of principal's trademark and logos).
Moreover, with regard to reasonable belief, all of Crowther's clients included in the final restitution pool attested, via affidavit or sworn questionnaire response, that they thought they were direct clients of KIA or that Crowther was an employee, owner, or agent of KIA. These statements, taken together with the manifestations of the KIA defendants, are sufficient to establish that Crowther's clients reasonably believed that he had the authority to act on behalf of KIA.[19] See Hudson, 386 Mass. at 457 ; Linkage Corp., 425 Mass. at 16-17. Finally, as the judge explained in her order granting the motion, the KIA defendants' offer of proof did not demonstrate a question of material fact as to either of these elements.[20]
Judgment affirmed.

By posttrial ruling, the judge allowed the Commonwealth's renewed motion for summary judgment on this issue. We discuss this ruling in more detail below.

Wholesale brokers serve as "middle men" between retail brokers, who manage all contact with the insureds, and surplus lines insurance carriers.

The commission typically amounts to between 17.5 and 20 percent of the total premium price. Usually, the wholesale broker divides the commission such that the retail broker receives 10 percent of the total premium price, and the wholesale broker receives the remainder of the total commission. It is also an accepted practice, though not routine, for the retail broker to either (1) reject the commission so that it can then charge a separate agency fee, or (2) have the policy issued "net commission," i.e., without commission, allowing both brokers to charge separate fees for their services. It is not customary to charge an agency fee in addition to a commission and, whenever an agency fee is charged, it is industry custom to disclose it to the insured.

The "binder" is a placeholder document that stays in effect until it is replaced by the official policy, which is often issued weeks after the parties reach an agreement. During that interim period, the binder serves as evidence of insurance and contractually binds the insurer and insured.

The wholesale broker, retail broker, and the insured sign the affidavit, which, among other things, establishes the amount of the premium set by the insurer for purposes of State taxation.

Crowther initially served as an in-house broker for another Kilgore business venture, A.B.K. Insurance Agency, Inc. (A.B.K.). By 1999 or the early 2000s, A.B.K. was dissolved or merged into KIA. To the extent that the judge found that Crowther started work at KIA in 1995 or 1996, any error was immaterial.

As these defendants share a surname, we refer to them by their first names to avoid confusion.

Sometimes customer service representatives signed the brothers' names on the finance agreements, which they were authorized to do.

The judge ruled pretrial that Crowther's practice of rolling his agency fee into the bottom-line cost without disclosure to his clients did not, as matter of law, violate G. L. c. 93A. The Commonwealth does not challenge that ruling on appeal.

When it came to the bottom-line price, Crowther's practice as to his commission varied. However, even when he accepted his commission, he always charged an agency fee. On average, that fee was forty-seven percent of the premium price.

Steven Guy, a KIA in-house producer whose testimony the judge explicitly credited, stated that the standard commission on admitted market policies was twice the commission on surplus lines policies (which often required more work to place), and that he charged his one surplus lines client around a twenty percent fee. Cyrus Kilgore also charged a surplus lines client a fee in the seventeen to twenty percent range.

Burke understood the word "premium" to mean the total cost of the insurance, including all component parts; and she believed that the clients had the same understanding. From her many years on the job, she understood that broker commissions and fees were confidential and generally not disclosed to clients; and that KIA had taken steps to determine the propriety of Crowther's fee-based compensation.

Crowther also claims that the judge erred in considering claims that were time-barred pursuant to G. L. c. 260, § 5A. The record is unclear as to whether the issue was preserved for appeal and properly before us. See Coastal Oil New England, Inc. v. Citizens Fuels Corp., 38 Mass. App. Ct. 26, 29 n.3 (1995) (pursuant to Mass.R.Civ.P. 8 [c], 365 Mass. 749 [1974], "[a] party is required to plead the affirmative defense of statute of limitations in its answer," and the failure to do so "constitutes a waiver of that defense"). See also Shawmut Community Bank, N.A. v. Zagami, 30 Mass. App. Ct. 371, 372-373 (1991), S.C., 411 Mass. 807, 810-812 (1992) ; Davis v. Tabachnick, 425 Mass. 1010, 1010 (1997). Assuming, without deciding, that the issue has not been waived, we agree with the judge that the "discovery rule" defeats any statute of limitations argument under the facts of the present case.

That Crowther's clients may have sought to negotiate his compensation is exemplified by the testimony of John Brussard. Brussard explained that, after discovering Crowther's hidden agency fee, he demanded and received lower fee charges. We also note that upon discovery of Crowther's nondisclosure, Brussard demanded and obtained a partial refund of undisclosed fees from prior policy years.

The KIA defendants had over four months -- between the day they were first ordered to make an offer of proof and the day their summary judgment opposition was due -- to take depositions of Crowther's clients on issues relevant to apparent authority and include such evidence in the record. Although the judge encouraged them to do so during this period, they failed to take any depositions.

In support of the proposition that detrimental reliance is an element of apparent authority, the KIA defendants cite language from Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 745 (2000), which states that "[a]pparent authority exists only if the plaintiff reasonably relied on the principal's words or conduct at the time he entered the transaction that the agent is authorized to act on the principal's behalf." This language does not establish detrimental reliance as an element of apparent authority. Noting that it does not contain the word "detriment," we read it simply as an expression of the operative point in time for purposes of the apparent authority analysis: the time of the transaction at issue.

The KIA defendants argue that the judge erred by not requiring "individualized testimony" from each of Crowther's clients because failing to do so denied them the "opportunity to inquire into the validity and reasonableness" of the clients' belief in Crowther's authority. However, the KIA defendants were not denied such an opportunity and, therefore, the judge did not err in this regard. As we discussed in note 16, supra, the judge gave them months to depose Crowther's clients on this question and they chose not to do so. Further, to the extent the KIA defendants argue that each client was required to give traditional in-court testimony in order to prove their reasonable belief, we disagree. See generally Commonwealth v. Chatham Dev. Co., 49 Mass. App. Ct. 525, 528 (2000) ("An action brought by the Attorney General under G. L. c. 93A, § 4, is comparable to a class action").

Other points raised by the defendants that are not discussed herein "have not been overlooked. We find nothing in them that requires discussion." Commonwealth v. Domanski, 332 Mass. 66, 78 (1954).